(169 App. Div. 534)

### In re LAUTERBACH.

(Supreme Court, Appellate Division, First Department. November 5, 1915.)

ATTORNEY AND CLIENT ☞58—PROFESSIONAL MISCONDUCT—WHAT CONSTITUTES.

    Where an attorney, desiring to regain a former client's business in conjunction with another, falsely represented that he was in close touch with powerful politicians, and suggested the advisibility of his representing the former client in proposed congressional business investigations, at the same time offering to waive his fee, he is guilty of professional misconduct deserving severe censure, though not disbarment; he and the client being at arm's length.

    [Ed. Note.—For other cases, see Attorney and Client, Cent. Dig. §§ 76–78; Dec. Dig. ☞58.]

Proceeding against Edward Lauterbach, an attorney, for professional misconduct. Respondent censured.

Argued before INGRAHAM, P. J., and LAUGHLIN, CLARKE, SCOTT, and DOWLING, JJ.

Einar Chrystie, of New York City (Austen G. Fox, of New York City, of counsel), for petitioner.

Thomas Thacher and William N. Cohen, both of New York City, for respondent.

PER CURIAM. This is a case quite out of the ordinary. The respondent is a well-known lawyer, now 70 years of age or over, who has for half a century occupied a conspicuous position as a lawyer and politician. The charges against him grow out of his efforts to rehabilitate himself in the good graces of the banking firm of J. P. Morgan & Co., with whom he says he had had in the past friendly and profitable relations, which relations, however, had been broken off in consequence, as he believed, and as is doubtless the fact, of his known intimacy with a person named Lamar, whose practices had made him a subject of suspicion and dislike to the firm of J. P. Morgan & Co., as well as to other bankers. The charge against the respondent is that he used unprofessional and improper methods in his efforts to regain his lost standing with the Morgan firm and to enjoy the benefits which would result from a renewal of friendly relations with them.

The case is submitted to us, by stipulation, upon the petition of the Association of the Bar and the respondent's answer thereto, and upon the testimony taken upon the proceedings had before the committee on grievances of the Association of the Bar, upon the investigation of the charges against respondent, including the testimony given by him as a witness before a subcommittee of the committee on the judiciary of the United States Senate. The testimony thus stipulated is contained in a printed volume of nearly 500 pages. Much of it is repetitious, the same evidence having been given before the grievance committee and before the subcommittee of the Senate judiciary committee. It is further stipulated that the charges against the respondent may be disposed of and determined by this court upon said papers and testimony without a reference, which is expressly waived, unless this court should be of opinion that such reference is necessary and advisable.

We have examined the record thus submitted, and are convinced that nothing, save delay, is to be gained by ordering a reference. All that would be accomplished would be to take over again, for a third time, the testimony already given before the grievance committee and the Senate subcommittee. As early as the year 1910 the respondent approached directly certain members of the firm of J. P. Morgan & Co. respecting a proposed congressional investigation of certain matters affecting the United States Steel Corporation, in which the Morgan firm was generally understood to be largely interested. The general purport of his communication to the members of the firm was that such an investigation was projected, and that he was in a position, if retained for that purpose, to forestall and prevent the investigation. He found the members of the firm cold and unresponsive to his suggestions and the investigation was had. Respondent was not called upon by the firm or the Steel Corporation to advise or render any services whatever.

Matters remained in this condition until the year 1913. On February 4th of that year, Mr. Lewis Cass Ledyard, a well-known member of the bar, was called to the telephone by a person who declared himself to be Congressman A. Mitchell Palmer of Pennsylvania. Mr. Ledyard was not, and never had been, attorney or counsel for the firm of J. P. Morgan & Co., or of any of the members of that firm, but he was generally known to be on terms of personal intimacy with Mr. J. P. Morgan and with other members of the firm. The person who represented himself as Congressman Palmer, and who ultimately proved to be Lamar, talked freely with Mr. Ledyard concerning the policies of the Democratic party, then about to come into control of all branches of the government, and also concerning what he declared to be the impression acquired by Speaker Clark of the House of Representatives and by leading Democrats as to what he termed the defiant attitude of Mr. Morgan and his associates towards certain congressional investigations. Upon being informed by Mr. Ledyard that the gentlemen spoken of were undoubtedly in error concerning the attitude of Mr. Morgan and his associates, Lamar, personating Congressman Palmer, stated that before pressing the matter further he would

make inquiries as to the reliability of the information received by the Speaker. On the following day Lamar, still impersonating Congressman Palmer, again called Mr. Ledyard on the telephone, and, after having been assured that Mr. Ledyard enjoyed the confidence of Mr. Morgan and other gentlemen interested in the Steel Corporation, stated that both Speaker Clark and himself (Palmer) were very anxious to have the doubt which had been cast upon the accuracy of the information which had been previously given to the Speaker, and which had been referred to in the conversation of the previous day, cleared up. He said that the person who had reported these facts to the Speaker was this respondent, who had gone to the Morgan firm by the explicit authority and direction of the Speaker, and returned with the report above indicated as to the attitude of the Morgan firm. He requested Mr. Ledyard to go over the matter with the respondent and ascertain the actual facts in the matter, after which he (Palmer, alias Lamar) would again talk with Mr. Ledyard.

It may be said, in passing, that the most of this appears to have been a pure fabrication. Respondent had never known Speaker Clark, had never gone to the Morgan firm by his authority and direction, and had never made any report to Speaker Clark or other Democratic leaders as to the attitude of the Morgan firm towards any Congressional investigation. So far as the record shows, the whole purpose of this elaborate misrepresentation on Lamar's part was to put respondent again in touch with the Morgan firm under such conditions as would lead that firm to believe that respondent was in a position to be peculiarly useful if retained.

Acting on the suggestion of the pretended Congressman Palmer, Mr. Ledyard on February 6, 1913, requested respondent to call upon him, which he promptly did. A somewhat prolonged conversation ensued, in the course of which respondent detailed at length his former relations with the Morgan firm, and the circumstances of his efforts to re-establish relations with the firm in 1910. He denied all that had been said by the alleged Congressman Palmer as to his mission from Speaker Clark or his report back to that gentleman as to the attitude of the Morgan firm. On the following morning respondent told Lamar about his visit to Mr. Ledyard and the substance of what took place thereat.

On the same day Lamar, still personating Congressman Palmer, again called Mr. Ledyard up and asked him if he had seen respondent, and, if so, as to the result of that interview. He also asked if the Morgan firm was in a frame of mind to cooperate with the Democratic administration. Mr. Ledyard expressed a desire to talk these matters over in person rather than by telephone, whereupon the person telephoning stated that he must first have a conference with Speaker Clark, Senator Stone, and some others. On the following day (February 8th) the same person again called up Mr. Ledyard and informed him that a conference had been had, and that it was considered inadvisable to discard the services of respondent, and he requested Mr. Ledyard to again send for respondent, who would have received full instructions, and perhaps after that a personal interview might be had with the person telephoning.

On the same day Mr. Ledyard again sent for respondent, who called upon him in the afternoon, and, after again going over his disappointment at having been ignored by the Morgan firm, stated that he came authorized and empowered to lay certain matters before Mr. Ledyard. He stated that the Attorney General to be appointed would be controlled by Speaker Clark; that it was probable that the radicals in Congress might attempt to do certain things affecting the Morgan interests, to wit: (1) The obtaining of control of the property of the subsidiaries of the Steel Corporation through receiverships. (2) Criminal proceedings against directors. (3) Obstruction to any dissolution plan, should such be desired. He then stated that he was instructed to say by authority that all of these matters could be controlled, upon certain stipulations being made and certain conditions agreed to, which he thereupon proceeded to state. These stipulations and conditions, five in number, included a provision that respondent be the conduit or intermediary through whom the desired results should be brought about. The other stipulations and agreements are immaterial to this inquiry. Respondent was careful to state that he was anxious to be retained by the Morgan and Steel interests mainly as a means of vindication and rehabilitation, and that the payment of a fee for his services would not necessarily be a condition, if deemed to be undesirable.

In view of the extraordinary character of these proposals, Mr. Ledyard not unnaturally asked respondent to state by whose authority he made these propositions, whereupon respondent replied, as Mr. Ledyard testifies, that he came by authority of Speaker Clark of the House of Representatives, and that, although he had not seen Speaker Clark personally, he had received his instructions directly from Senator Stone, whom he had seen personally, and who had told him that he was acting for Speaker Clark.

Respondent denies that he stated that he had seen and been authorized to speak by Senator Stone; but after very carefully considering all the evidence on this point we are convinced that Mr. Ledyard's version of the interview is the correct one and should be accepted. Respondent admits that Lamar, with whom he kept in close touch while these interviews were going on, assured him that he had Senator Stone's authority for proposing the conditions, and from that it was but a single step to mentioning Stone's name to Ledyard. There are other reasons which lead us to accept Mr. Ledyard's testimony on this point. Of course, by the time of this last interview, Mr. Ledyard had ascertained that the whole thing was engineered by Lamar, and no further interviews took place. Respondent continued for some time through other persons his efforts to be reinstated in favor with the Morgan firm, but without success. The whole thing was a fraud and a sham. Lamar was the person who personated Congressman Palmer, who had nothing to do with the matter, and did not know that his name was being used. Speaker Clark and Senator Stone knew nothing about the matter until long after the incident was closed. Respondent had at no time been in communication with either of them, and had no authority from either of them to make any representations to anybody. In fact, he had no acquaintance with either, except that he had on one occasion met Speaker Clark. The whole thing appears to have

been a scheme concocted and carried out by Lamar and the respondent to induce the firm of J. P. Morgan & Co. to employ respondent professionally. Whether Lamar had any more personal interest in view can only be surmised; the evidence does not show it. That respondent hoped to derive a profit by way of fees, in case he should succeed in his desires, goes without saying, and this doubtless was the main inspiration of his acts.

It is urged that, even if all that is charged against respondent is true, still he has not been guilty of wrongdoing in his professional capacity. With this contention we are unable to agree. Conceding that a lawyer is well within his rights in seeking to extend his clientele and to induce the intrusting of business to himself, still he is guilty of professional misconduct if he seeks business by false representations or by fraudulent practices. Clearly it was by this means that respondent sought to have himself employed by Morgan & Co. Not only did he seek to mislead them as to his ability to serve them, but he at least consented to the misuse of the names of gentlemen holding important and responsible positions in the administration. Such practices are, as it seems to us, clearly professional misconduct.

There is a difficulty as to what penalty should be imposed. The case is quite different from those which we commonly have to consider. No case is presented of a deception practiced upon the court or a client. While respondent sought to deceive the Morgan firm, they were not then his clients, and were not reposing any confidence in him. In fact, they were dealing at arm's length. Nor was there any attempt at blackmail, as that word is commonly understood. No threats, direct or veiled, were made, unless the statement that protection would be afforded if certain conditions were complied with implied a covert threat that persecution would follow upon a refusal to consent to the conditions. No money was demanded. If money was expected, it was to be in return for services rendered.

On the whole, we have concluded that the respondent should be severely censured, rather than suspended or disbarred, for certainly some penalty must be imposed, as we cannot allow such practices to go unrebuked. He is censured accordingly.